**Nana Asante DWOMOH, Petitioner,**

v.

**Charles C. SAVA, as the District Director of the New York District of the Immigration and Naturalization Service, Respondent.**

**No. 88 CV 6083 (KMW).**

United States District Court,
S.D. New York.

Oct. 13, 1988.

---

Simpson, Thacher & Bartlett, New York City, for petitioner.

Timothy Mac Fall, Sp. Asst., Rudolph W. Giuliani, U.S. Atty., New York City, for respondent.

OPINION

KIMBA M. WOOD, District Judge.

This case is before the Court on a Petition for a Writ of Habeas Corpus. Petitioner challenges a determination of the Board of Immigration Appeals ("BIA") denying petitioner political asylum. The BIA's determination is based on its interpretation of the definition of "refugee" in the Refugee Act of 1980 (the "Act"); the BIA interprets that definition to deny refugee status to an individual who supported a *coup d'etat* against the government of

Ghana. I conclude that the decision of the BIA must be reversed as a matter of law because the BIA's interpretation of the definition of "refugee" contravenes the intent of Congress as reflected in the Act itself and in the Act's legislative history.

## 1. FACTS

The record reflects the following facts. The petitioner, Nana Asante Dwomoh, is a thirty-one year old Ghanaian soldier who escaped from Ussher Fort Prison in Ghana on December 22, 1986. (Transcript of Proceedings Before the Immigration Judge, at 48–49 [hereinafter the "Transcript"]; Affidavit of Nana Asante Dwomoh, March 19, 1987, at ¶ 3 [hereinafter the "First Dwomoh Affidavit"]). Mr. Dwomoh had joined the Ghanaian Army in 1974, at the age of eighteen, and for the next eleven years he had pursued his military career, attaining the rank of Sergeant. (Transcript at 63; First Dwomoh Affidavit at ¶ 3.) However, by 1985, disturbed by worsening political conditions (including summary execution of eight generals and several judges, among others) and the threatened execution of a political prisoner who was a friend of his, he agreed to participate in resistance activities that included efforts to free his friend from prison and to support a coup against the military government. (First Dwomoh Affidavit, at ¶¶ 5–13.)

On November 6, 1985, the morning before the coup was to take place, a Ghanaian military patrol picked up Mr. Dwomoh and beat him in an unsuccessful attempt to obtain a confession. (Transcript at 42–43; First Dwomoh Affidavit, at ¶ 14.) After being arrested, beaten several times, and imprisoned by the Ghanaian military government for more than one year, without access to counsel, family or friends, Mr. Dwomoh escaped from the prison where he was held in Ghana and fled to the United States. (Transcript at 48–49, 91; Transcript of Proceedings Before the Immigration Judge in the Matter of Abubakari Shariff at 23–24, 73–74, 93 [hereinafter the "Shariff Transcript"].)

The Ghanaian military regime had seized power from a democratically-elected government in 1981, and has since prohibited all peaceful means of political change and expression, while simultaneously denying due process protections to those who seek political change through more forceful means.[1] There is every indication that, if returned to Ghana, Mr. Dwomoh will again be physically abused and possibly may be executed.

In a split decision, a majority of the BIA held that an individual such as Mr. Dwomoh cannot qualify for protection as a refugee under United States law on the basis of any of the facts recited here, including his resistance activities, which the BIA condemned as "treason."

## 2. THE PROCEEDINGS BELOW

■ The BIA upheld the Immigration Judge's denial of Mr. Dwomoh's petition for asylum and withholding of deportation, solely on the basis of the BIA's determination that the acts Mr. Dwomoh engaged in do not qualify him as a "refugee."[2] *In re*

---

1. Mr. Dwomoh has submitted substantial evidence indicating that the Ghanaian military regime is in fact a totalitarian government, in which political prisoners are often detained indefinitely, beaten, or executed, often without any form of trial. See *e.g.,* Department of State, *County Reports on Human Rights Practices for 1985* (1986); Department of State, *Country Reports on Human Rights Practices for 1986* (1987); Amnesty International, *Ghana: The Summary Execution or Detention Without Trial of People Suspected of Attempting to Overthrow the Government* (August 1984); Amnesty International, *Amnesty International Report 1986* (1986); Amnesty International, *Amnesty International Report 1987* (1987); Amnesty International, *Torture in the Eighties.*

2. Eligibility for asylum is determined by a less stringent standard than eligibility for the withholding of deportation. *INS v. Cardoza Fonseca,* 480 U.S. 421, 107 S.Ct. 1207, 1212–1213, 94 L.Ed. 2d 434 (1987). An applicant for asylum must establish a "well-founded fear of persecution," which has consistently been held to require less of a showing than the showing of "clear probability of persecution" required for withholding of deportation. *Id.,* 107 S.Ct. at 1212–1213. The issue here, whether an individual who was involved in a coup attempt is automatically disqualified from obtaining refugee status, is not affected by this distinction; consequently, this Court will address the question of refugee status in the context of asylum, as did the BIA. The

*Dwomoh,* A26 805 882 (BIA 1988) [hereinafter the "BIA Op."]. In the BIA's view, Mr. Dwomoh cannot qualify for refugee status because, unlike those who merely *express* political *views,* he participated in an unsuccessful *coup d'etat* (Mr. Dwomoh "is a fugitive from justice who faces prosecution for his role in an unsuccessful coup d'etat"). (BIA Op. at 4–5.)

In making its decision, the BIA made its own findings of fact and accepted Mr. Dwo-moh's account of the facts as true.[3] The BIA is authorized to review the decision of an Immigration Judge *de novo.*[4] In this case, it is clear that the BIA made a *de novo* review, rather than accept the findings of the Immigration Judge. Had the BIA accepted the Immigration Judge's findings, it would never have reached the legal question it decided—whether Mr. Dwomoh qualified as a refugee based on the facts as presented by Mr. Dwomoh.[5]

analysis and holding here are equally applicable to the withholding of deportation.

**3.** The BIA found the following facts: Mr. Dwomoh is a 31–year–old native and citizen of Ghana. He joined the Ghanaian Army in 1974, pursued a military career, and attained the rank of Sergeant. In the summer of 1985, Mr. Dwomoh was assigned as a weapons instructor at the Military Academy and Training School. While there, he learned that his friend Sergeant Tawiah was imprisoned for attempting to overthrow the Ghanaian Government. Mr. Dwomoh managed to obtain Mr. Tawaiah's release from prison by agreeing with Warrant Officer Afful to participate in an attempted *coup d'etat.*

The planned *coup* was discovered by government officials, and Mr. Dwomoh was arrested, charged with mutiny, and interrogated. He was beaten several times during the interrogation, and afterwards was sent to Usser Fort Prison, where prisoners are denied access to all visitors and many prisoners "disappear."

Mr. Dwomoh remained in that prion for over a year. Twice in late 1986 he was taken to a military hospital for examination. On the second visit to the hospital, Mr. Dwomoh escaped through a bathroom window. Mr. Dwomoh fled to Nigeria, where he arranged through a friend to obtain a boarding pass on a flight to New York.

Mr. Dwomoh admitted that he conspired to overthrow the Ghanaian Government; the BIA found that his motive for doing so was to obtain the release of Sergeant Tawiah and to demonstrate his opposition to the regime headed by Chairman Rawlings. (BIA Op. at 2–3.)

**4.** See C. Gordon and E.G. Gordon, Immigration and Nationality Law § 1.8d, at 1–15 (1980) ("The Board can make its own independent determinations on questions of fact and law, and on whether discretionary relief should be granted [footnote omitted]."); 8 C.F.R. 3.1(d)(1).

**5.** The Court notes that had the BIA accepted the Immigration Judge's findings of fact as correct, such acceptance would have constituted reversible abuse of discretion. Under any standard of review, the findings of the Immigration Judge cannot stand.

One of the three credibility findings made by the the Immigration Judge contradicted a finding he himself had made four months before in a related case, and yet the Immigration Judge made no mention in this case of his prior finding. In *In the Matter of Abubakari Shariff,* A26 805 884, June 9, 1987, Oral Decision of the Immigration Judge, 2 [hereinafter the "Shariff IJ Op."], Immigration Judge Howard Cohen found that both Mr. Shariff and Mr. Dwomoh escaped from a hospital where they had been taken for medical treatment, and that the two of them escaped to Togo and eventually to the United States (relying on the testimony of both Mr. Shariff and Mr. Dwomoh, who testified on Mr. Shariff's behalf). Four months later, after hearing testimony from Mr. Dwomoh that paralleled his prior testimony and that of Mr. Shariff regarding the escape, Immigration Judge Cohen expressed doubt as to whether the escape took place.

In addition, the Immigration Judge plainly ignored substantial parts of Mr. Dwomoh's uncontradicted testimony. Among other things, the Immigration Judge found Mr. Dwomoh's version of his participation in a coup attempt incredible because he thought it improbable that Mr. Dwomoh would agree to participate in a coup with "a man he never met before," Officer Afful (In the Matter of Nana Asante Dwomoh, A26 805 882, October 30, 1987, Oral Decision of the Immigration Judge, 5 [hereinafter the "Immigration Judge's Op." ] ); yet, *the uncontradicted testimony of Mr. Dwomoh is clear on this point: Mr. Dwomoh did know Officer Afful prior to agreeing to participate in a coup with him, because Officer Afful had been Mr. Dwomoh's instructor at a military training center.* (Transcript at 33.) In addition, the Immigration Judge found incredible the "fact" that Mr. Dwomoh made no effort to contact anyone during the time he was detained. (Immigration Judge's Op. at 5.) There is no evidence to support this conclusion; the only evidence is Mr. Dowmoh's testimony that he was held in isolation and was *denied* the right to see any visitors. (Transcript at 65–66.)

The Immigration Judge also based his credibility findings on an unreasonable assessment of whether one form of escape should have been chosen over another; the Immigration Judge speculated that it would have been more reasonable for Mr. Dwomoh to escape on the way to

In addition, the language of both the majority opinion and the dissent indicates that the BIA found the facts to be as related in the opinion.

### 3. STANDARD OF REVIEW

■ The Court here is reviewing the BIA's construction of a statute, rather than BIA findings of fact or the application of those facts to the law. The Supreme Court has held that if Congress has explicitly addressed the question at issue, the Court must give effect to Congress' intent:

> When a court reviews an agency's construction of the statute which it administers, it is confronted with two questions. First, always, is the question whether Congress has directly spoken to the precise question at issue. If the intent of Congress is clear, that is the end of the matter; for the court, as well as the agency, must give effect to the unambiguously expressed intent of Congress. [Footnote omitted.] If, however, the court determines Congress has not directly addressed the precise question at issue, the court does not simply impose its own construction on the statute.... [T]he question for the court is whether the agency's answer is based on a permissible construction of the statute. [Footnote omitted.]

*Chevron U.S.A. Inc. v. Natural Resources Defense Council, Inc.*, 467 U.S. 837, 842–843, 104 S.Ct. 2778, 2781–2782, 81 L.Ed.2d 694 (1984). Here, Congress has unambiguously expressed its intent regarding the definition of "refugee"; because the intent of Congress on the precise question at issue is so clear, this Court must review the decision of the BIA without giving any particular deference to the BIA's statutory interpretation.[6]

The Supreme Court rejected the BIA's argument that its construction of the Refugee Act of 1980 is entitled to substantial deference in similar circumstances in *INS v. Cardoza–Fonseca*, in 1987, stating:

> The Government argues that the BIA's construction of the Refugee Act of 1980 is entitled to substantial deference, even if we conclude that the Court of Appeals' reading of the statutes is more in keeping with Congress' intent. [Footnote omitted.] This argument is unpersuasive.... "The judiciary is the final authority on issues of statutory construction and must reject administrative constructions which are contrary to clear congressional intent. [Citing cases.] If a court, employing traditional tools of statutory construction, ascertains that Congress had an intention on the precise question at issue, that intention is the law and must be given effect."

*supra*, 107 S.Ct. at 1220–1221, quoting *Chevron, supra*, 104 S.Ct. at 2781. See also, *Carcamo–Flores v. INS*, 805 F.2d 60, 68 (2d Cir.1986) ("A reading of the board's opinion in this case leaves at least room for significant doubt as to whether the appropriate standard was applied.... We therefore remand the case for further proceedings in which the board is directed to apply explicitly and clearly the well-founded fear test....").

### 4. THE DEFINITION OF REFUGEE

■ The BIA takes the position that a person can qualify for refugee status if he faces prosecution for openly *espousing* anti-government views, but that he cannot so qualify if he faces prosecution for *acting* on those views, where his action takes the form of a politically motivated attempt to overthrow the government by violent means. (BIA Op. at 4.) Without considering the fact that in totalitarian govern-

---

the hospital (*i.e.,* from a small bus carrying an armed guard, a driver and seven prisoners) than to escape, as Mr. Dwomoh and Mr. Shariff did, from a hospital lavatory window, where the guard outside the lavatory was "relaxed," not "paying attention at all," or (as Mr. Shariff testified) "sleeping." (Transcript at 94; Immigration Judge Op. at 5; Shariff Transcript at 24.)

**6.** In both *Chevron* and *Cardoza–Fonseca*, the Supreme Court looked to the history of the legislation, as well as the legislation itself, to determine whether Congress expressed a specific intention on the issue in question. See *Chevron*, 104 S.Ct. at 2783 ("Based on the examination of the legislation and its history which follows, we agree ... that Congress did not have a specific intention....").

ments a person may have only one chance to express or act upon anti-government views, and that the only means of effecting political change may be to overthrow the government, the BIA compared Ghana to the United States and stated that both countries have the right to enforce their laws against treason and insurrection, even by imposition of the death penalty. (BIA Op. at 11.) On the question of whether the beatings and one year's detention of Mr. Dwomoh without permitting him contact with the outside world constitute "persecution on account of ... political opinion" within the Congressional definition, the BIA stated, "... he was subjected to mistreatment due to his refusal to provide information about the attempted *coup d'etat*, not because of any political view he may hold." (BIA Op. at 3.) In determining whether the punishment petitioner faced and faces is persecution on account of political opinion, the BIA relied both on its view that governments have the right to enforce laws against treason, and a statement in a publication of the United Nations High Commissioner for Refugees that persons fleeing from punishment for common law offenses are not normally refugees. United Nations High Commissioner for Refugees, *Handbook on Procedures and Criteria for Determining Refugee Status*, (Geneva, 1979), p. 15 [hereinafter the *"UNHCR Handbook"*].

### A. *Legislative History of the Definition of "Refugee"*

In 1980, the Congress adopted a new definition of "refugee" as part of a comprehensive overhaul of United States policy regarding refugee resettlement and assistance. One of the "five basic objectives" of the Act, according to the Senate Report, was to provide a new definition of a refu-

gee. Senate Report No. 96–256, P.L. 96–212 p. 1, U.S.Code Cong. & Admin.News 1980, p. 141. The new definition provides that an applicant is a "refugee" if he

> is unable or unwilling to return to, and is unable or unwilling to avail himself or herself of the protection of, [his or her] country because of persecution or a well-founded fear of persecution on account of race, religion, nationality, membership in a particular social group, or political opinion.

The Senate Report stated its intention in adopting a new definition of "refugee":

> the new definition will bring United States law into conformity with our international treaty obligations under the United Nations Protocol Relating to the Status of Refugees which the United States ratified in November 1968, and the United Nations Convention Relating to the Status of Refugees which is incorporated by reference into United States Law through the Protocol.

Senate Report No. 96–256, P.L. 96–212 p. 4, U.S.Code Cong. & Admin.News 1980, p. 144.[7]

The Supreme Court has held that one of Congress' primary purposes in adopting a new definition of refugee was to conform United States refugee law to the U.N. Protocol and Convention:

> if one thing is clear from the legislative history of the new definition of 'refugee,' and indeed the entire 1980 Act, it is that one of Congress' primary purposes was to bring United States refugee law into conformance with the 1967 United Nations Protocol Relating to the Status of Refugees....

*Cardoza–Fonseca*, 107 S.Ct. at 1216. Thus, in order to interpret Congress' definition of "refugee," this Court must look to

---

7. The *House Conference Report* noted that the definition of refugee contained in the U.N. Convention and Protocol Relating to the Status of Refugees was incorporated in the final version of the bill:

> The Senate bill incorporated the internationally-accepted definition of refugee contained in the U.N. Convention and Protocol Relating to the Status of Refugees.... The House amendment incorporated the U.N. definition,

as well as Presidentially-specified persons within their own country who are being persecuted or who fear persecution. The House amendment specifically excluded from the definition persons who themselves have engaged in persecution. The Conference substitute adopts the House amendment.

House Conference Report No. 96–781, P.L. 96–212, p. 19, U.S.Code Cong. & Admin.News 1980, p. 160.

the definition of "refugee" embodied in the Protocol.

However, the Supreme Court also recognized that, by itself, the Protocol could not provide a definitive meaning of the term "refugee." This was because the Protocol, like the Refugee Act of 1980 itself, had merely adopted a pre-existing legal definition.

The Supreme Court thus reviewed the origin of that pre-existing definition. The Protocol's definition of "refugee" originated in the 1946 Constitution of the International Refugee Organization ("IRO"). *Id.* The IRO definition is incorporated in the 1951 United Nations Convention Relating to the Status of Refugees ("Convention"); it was adopted in the Protocol without change. *Id.* Thus, the Supreme Court did not examine the Protocol in isolation; in order to give effect to "Congress' intent that the new statutory definition of 'refugee' be interpreted in conformance with the Protocol's definition," this Court must analyze the Protocol within the broader context of interpretations of the IRO Constitution and the 1951 Convention, as well as the interpretations of the Protocol itself. *Id.*

In *Cardoza–Fonseca,* the Supreme Court based its interpretation of the refugee definition on extensive historical sources interpreting all three of these documents. *Id.* Similar sources are available here. Guidance in interpreting the Convention and Protocol is found in the *UNHCR Handbook,* although that document does not carry the force of law. *Id.* at 1217. In addition, numerous sources demonstrate that from World War II to as recently as this June, the nations of the international community, including the United States, have consistently interpreted the definition of a refugee contained in these treaties so as to protect individuals who have engaged in resistance activities against totalitarian governments.

The international community's inclusion of such individuals within the term "refugee" in fact predates the 1946 IRO Constitution. A historian cited by the Supreme Court as a "leading authority" in refugee law states that throughout World War II, the Allies applied refugee protection principles to protect individuals persecuted on account of their resistance activities against the Nazi regime and other totalitarian governments, including individuals who were guilty of treason. 1 A. Grahl–Madsen, The Status of Refugees in International Law 228–229 (1966); cited in *Cardoza–Fonseca,* 107 S.Ct. at 1213. In 1950, in its Manual for Eligibility Officers, the IRO referred to the long-standing international practice under extradition law of refusing to return individuals accused of purely political crimes aimed directly against a government, concluding that the same principle should be applied in refugee law.[8] The Supreme Court specifically relied on interpretation of the IRO definition of "refugee" in interpreting the United Nations' definition of refugee:

> The interpretation afforded to the IRO definition is important in understanding the United Nations' definition since the Committee drafting the United Nations' definition made it clear that it sought to "assure that the new consolidated convention should afford at least as much protection to refugees as had been provided by previous agreements."

*Cardoza–Fonseca,* 107 S.Ct. at 1216 n. 20, quoting United Nations Economic and Social Council, Report of the Ad Hoc Committee on Statelessness and Related Problems 37 (Feb. 17, 1950) UN Doc. E/1618, E/AC.32/5.

The 1951 Convention was adopted within this context of affording refugee protections to individuals engaged in resistance

---

**8.** A purely political crime is distinguishable from a common crime directed at civilians (such as bank robbery) committed out of political motives. "The idea of the purely political offense is a comparatively simple one. The German Extradition Law of 1929 described it as an offense 'directed immediately against the existence or the security of the State, against the head or a member of the government of the State, as such, against a body provided for by the constitution, . . . .' " I.A. Shearer, *Extradition in International Law* 182 (1971), quoting Law of 23 Dec. 1929, art. 3(2).

activities against a totalitarian government. Grahl–Madsen states that in view of the history of pre–1951 action on behalf of resistance activists, "it is hardly surprising that Article 1A(2) of the Refugee Convention has been interpreted so as to apply to persons fearing punishment in their country of origin for offences which they have committed out of political motives." Grahl–Madsen, supra, at 229.

Since the 1951 Convention, the United States has often extended refugee protection to individuals engaged in resistance activities against totalitarian regimes. In 1965, the Department of State declared in a note to the Cuban Foreign Ministry that the United States would accept and accord asylum to "persons imprisoned in Cuba for offenses of a political nature." United States Department of State, 53 *Department of State Bulletin* 853 (1965).[9] In 1970, the United States refused to extradite three Panamanian military officers who had escaped from a military prison where they were incarcerated following an abortive coup. The United States' refusal to return the officers, despite the demand of the Panamanian government, was based on United States "adherence to the United Nations Protocol on the Status of Refugees." See *Poschl v. United States,* 206 Ct.Cl. 672, 678 (1975). It has been reported that as recently as March 1988, the United States granted asylum to two Panamanian officers who attempted an unsuccessful coup against President Noriega. Facts on File, *World News Digest* 229 (Apr. 8, 1988).

Most recently, the BIA granted asylum to the very individual who fled from Ghana with Mr. Dwomoh, Abubakari Shariff, whose petition for asylum was based on his having been involved in a separate plot to overthrow the Ghanaian government. (Shariff Transcript at 18–20.) Mr. Shariff, also a member of the Ghana Armed Forces, had also been arrested for participation in a coup attempt, was imprisoned in the same prison as Mr. Dwomoh, escaped from prison with Mr. Dwomoh, and fled to the United States with Mr. Dwomoh. He was granted asylum in January of this year. See *Matter of Shariff,* A26 805 884 (EOIJ, June 9, 1987); *Matter of Shariff,* A26 805 884 (BIA 1988).

## B. The Structure of the 1980 Refugee Act

The Government argues that even if a person commits a political crime (such as treason), he should be denied refugee status unless the punishment is pretextual or its severity is heightened by the person's race, religion, nationality, social group or political opinion. But the inclusion of individuals accused of serious political crimes among those qualified as refugees is implied in the very structure of the Act. In determining whether an individual qualifies as a refugee, the finder of fact must first consider whether that individual faces persecution on account of one of the five standard inclusion clauses—race, religion, nationality, membership in a particular social group, or political opinion. 8 U.S.C. § 1101(a)(42)(A); 8 U.S.C. § 1253(h)(1). Once it is determined that the applicant would be persecuted on account of one of these criteria, the finder of fact must assess whether the applicant is nonetheless to be denied refugee status because he falls within one of the exclusion clauses.[10] The applicant is excluded from refugee status if he "has committed a serious non-political crime...." 8 U.S.C. § 1253(h)(2)(C); 1951 Convention, Article 1 F; *UNHCR*

---

**9.** The Court notes that it is unclear whether these "offenses" were resistance activities or merely speech.

**10.** In this regard, the statute parallels provisions of the 1951 Convention, summarized by the *UNHCR Handbook* as follows:

30. The provisions of the 1951 Convention defining who is a refugee consist of three parts, which have been termed respectively "inclusion", "cessation" and "exclusion" clauses.

31. The inclusion clauses define the criteria that a person must satisfy in order to be a refugee. They form the positive basis upon which the determination of refugee status is made. The so-called cessation and exclusion clauses have a negative significance; ... the latter enumerate the circumstances under which a person is excluded from the application of the 1951 Convention although meeting the positive criteria of the inclusion clauses. *UNHCR Handbook,* p. 9.

*Handbook,* pp. 35–36. The explicit exclusion of persons who have commited nonpolitical crimes implies that individuals who have been accused of or even committed serious political crimes may qualify as refugees.

## 5. THE BIA'S DETERMINATION

The BIA failed to consider the legislative history of the Act, the structure of the Act, and judicial and executive interpretations of the definition of refugee, and relied instead almost exclusively on the *UNHCR Handbook.* Certainly the *UNHCR Handbook* provides useful guidance; here, however, the BIA's application of the principles it contains was flawed.

In applying the *UNHCR Handbook's* guidelines, the BIA correctly found that Mr. Dwomoh was not unjustly accused of committing a crime as a pretext for punishing him for his political opinions; after all, Mr. Dwomoh admits that he participated in a conspiracy to overthrow the Ghanaian government. However, the possibility that prosecution may be a pretext for persecution is but one factor to be considered, even within the parameters suggested by the *UNHCR Handbook.* The *UNHCR Handbook* states:

> 85. Whether a political offender can also be considered a refugee will depend upon various other factors. Prosecution for an offence may, depending upon the circumstances, be a pretext for punishing the offender for his political opinions or the expression thereof. Again, there may be reason to believe that a political offender would be exposed to excessive or arbitrary punishment for the alleged offence. Such excessive or arbitrary punishment will amount to persecution.
> 86. In determining whether a political offender can be considered a refugee,

regard should also be had to the following elements: personality of the applicant, his political opinion, the motive behind the act, the nature of the act committed, the nature of the prosecution and its motives; finally, also, the nature of the law on which the prosecution is based.

The BIA did consider some of the other factors listed, though by no means all, and in doing so applied them erroneously.

In evaluating the nature of the crime with which Mr. Dwomoh is charged and the punishment he may face, the BIA noted American laws against treason and insurrection. The *UNHCR Handbook* notes that in evaluating the laws and punishments of other countries, it is often useful to compare those laws to national legislation; in this case, however, the comparison was inapt. The United States has procedures whereby citizens can change their form of government peaceably. In Ghana, where no such procedures exist,[11] a coup may be the only means by which political change can be effected. In addition, while it is true that the United States has laws against treason, and punishes violators of those laws severely, United States law also provides due process protections. No United States citizen is punished for treason without a formal charge, and the opportunity for a full trial and appeal. Mr. Dwomoh has no such protections; he might be executed without ever having been charged, no less tried. The BIA did not consider whether Mr. Dwomoh would have due process protections or whether he would be punished arbitrarily. In summary, the BIA relied on a faulty comparison with the United States in evaluating the factors listed in the *UNHCR Handbook, i.e.,* the nature of the act committed, the nature of the prosecution, and the nature

---

**11.** According to the United States State Department:

The PNDC under Chairman Rawlings exercises total executive, legislative, judicial, and administrative power in Ghana (PNDC Law 42). There are no elections to governing organs and no current procedure by which citizens can freely and peacefully change their laws, officials, or form of government.

United States Department of State, Country Reports on Human Rights Practices for 1985, Ghana, at 132; Country Reports on Human Rights Practices for 1986, Ghana, at 130. See also Country Reports on Human Rights for 1987, at 124.

of the law upon which the prosecution is based.

An accurate assessment of the political conditions existing in the particular country at the time the political crime is committed is central to the determination of whether prosecution for a political crime constitutes persecution under the guidelines set forth by the UNHCR. It may be that as a general rule prosecution for an attempt to overthrow a lawfully constituted government does not constitute persecution. However, the UNHCR does not view that general rule as applicable in countries where a coup is the only means through which a change in the political regime can be effected. When petitioner's counsel here sought an opinion from the UNHCR on this point, *i.e.*, whether that general rule would apply "where a country does not allow the peaceful expression of political expression of [*sic*] political opinion and has no procedure by which citizens can peacefully seek to change their laws, officials, or form of government," the UNHCR Geneva replied:

> One has to bear in mind that in Africa, a coup is often the only means through which a change in the political regime can be effected, and a successful coup legitimizes, by its very success, the new regime it puts into place. As a result fears of persecution arising from an unsuccessful coup attempt may be regarded as grounded upon political opinion/activities and within the ambit of the 1951 Convention.

Letter from UNHCR to Bradford Smith, Esq., August 30, 1988.

Secondly, the BIA noted that Mr. Dwomoh's "motive for conspiring to overthrow the government was to obtain the release of Sergeant Tawiah, a political dissident, and to demonstrate his opposition to the regime headed by Chairman Rawlings," and then completely disregarded its finding that Mr. Dwomoh's acts were at least par-

tially a political expression. The BIA also ignored evidence that Sergeant Tawiah was a political prisoner, and that Mr. Dwomoh may therefore have had a motive in addition to friendship for obtaining his release.

The BIA opinion makes no mention of the personality or character of the applicant.

The BIA held that because Mr. Dwomoh had not expressed political opinions critical of the Ghanaian regime prior to the coup attempt, "he is not facing prosecution for his political views but rather for the ... act of trying to overthrow the Government of Ghana." In so doing, the BIA ignored the reality that in certain countries individuals who express opposition to the government are jailed, and in certain of those countries, an attempted coup is the only way to change the government. In such a country, a person desirous of changing the government would be ill advised to express his opposition publicly before attempting a coup. In that context, his political expression is embodied in his political act.

## 6. THE CORRECT DEFINITION OF REFUGEE

In light of the legislative history and the structure of the Refugee Act of 1980, discussed above, I conclude that in countries where there is no procedure by which citizens can freely and peacefully change their laws, officials or form of government, and where some individuals who express views critical of the government are arrested and held incommunicado for long periods without due process, a coup attempt is a form of expression of political opinion the prosecution of which can qualify as "persecution" within the statutory definition of "refugee." When a participant in an attempted coup has been beaten or tortured during detention, there is no doubt that he is being persecuted on account of his political opinion.[12]

---

12. The Court notes that based on the uncontroverted evidence contained in the record, Mr. Dwomoh does qualify as a refugee. The BIA found that Mr. Dwomoh participated in a coup attempt against the government of Ghana, to free a political dissident and to express his op-

position to the government. (BIA Op. at 2, 4.) In addition, according to the State Department, Ghana is a country in which

> the PNDC under Chairman Rawlings exercises total executive, legislative, judicial, and administrative power in Ghana (PNDC Law 42).

## 7. THE REMEDY

■ Because the BIA incorrectly concluded that Mr. Dwomoh's participation in a coup attempt made him ineligible for refugee status, the decision of the BIA must be reversed and this Court must remand the case to the BIA to determine whether Mr. Dwomoh qualifies as a refugee under the appropriate definition. In cases where the Court of Appeals has concluded that the BIA's denial of a request for asylum and withholding of deportation was based on the application of an incorrect standard, the Second Circuit has held that the appropriate remedy is to remand:

> where an alien asserts a fear of persecution and presents some objective evidence supporting that fear, it is the responsibility of the immigration judge and the BIA to assess the proof in light of the correct test, and we will not do so in the first instance on appeal.

*Brice v. United States Department of Justice,* 806 F.2d 415, 418 (2d Cir.1986), citing *Carcamo–Flores v. INS, supra,* 805 F.2d at 68.[13] The Court notes that the uncontroverted evidence in the record, along with those facts found by the BIA, are sufficient for this Court to conclude that Mr. Dwomoh qualifies for asylum under the Congressional definition of refugee. However, in light of the Second Circuit's decisions in *Brice* and *Carcamo–Flores,* this Court will remand the case to the BIA for further proceedings.

Accordingly, the decision of the BIA is hereby reversed; the case is remanded to the BIA for any additional findings of fact made necessary by this Opinion, the application of the appropriate definition of "refugee" to the facts previously found by the BIA and any additional facts found on remand, the discretionary grant or denial of asylum, and the determination of whether Mr. Dwomoh has met the requirements for withholding of deportation to Ghana, Togo, and Nigeria. In light of the continued incarceration of Mr. Dwomoh, counsel for the parties are hereby directed to move for expedited consideration of this case by the BIA.

SO ORDERED.

> There are no elections to governing organs and no current procedure by which citizens can freely and peacefully change their laws, officials, or form of government.

United States Department of State, Country Reports on Human Rights Practices for 1985, Ghana, at 132; Country Reports on Human Rights Practices for 1986, Ghana, at 130. See also Country Reports on Human Rights for 1987, at 124.

13. In each of the Second Circuit cases, the INS was seeking affirmance of the BIA decision, even though the BIA applied the wrong standard. In each case, the Second Circuit declined to find that the petitioner could not have met the correct standard.

In the Ninth Circuit, however, where the Court determines that the BIA applied an incorrect standard or interpretation of law, the Court has been willing to find that petitioner does qualify as a refugee, and has thus established his eligibility for asylum. The Court then remands for the discretionary grant or denial of asylum, and, if necessary, for a determination of whether petitioner met the higher standard required for withholding of deportation. *Desir v. Ilchert,* 840 F.2d 723, 729 (9th Cir.1988). See also, *Bolanos–Hernandez v. INS,* 767 F.2d 1277, 1288 (9th Cir.1984) (where the BIA erred as a matter of law, Court concluded that alien met the standard for withholding of deportation and *a fortiori* met the standard for asylum); *Damaize–Job v. INS,* 787 F.2d 1332, 1338 (9th Cir. 1986) (where BIA decision not supported by substantial evidence, Court concluded that petitioner met the standard for withholding of deportation, and *a fortiori* qualified for asylum); *Del Valle v. INS,* 776 F.2d 1407, 1409, 1414 (9th Cir.1985).

Because Mr. Dwomoh is presently incarcerated (as he has been for more than 650 days), there is particular merit in the Ninth Circuit approach, which avoids the delay and expense of remanding for additional proceedings. However, in light of the Second Circuit decisions which appear to require that the BIA be given the first opportunity to apply the correct legal standard to the facts in the record, this Court feels constrained to remand the case to the BIA.