**Edith NAMAHORO, Petitioner,**

v.

**John ASHCROFT, United States Attorney General, and the United States Immigration and Naturalization Service, Respondents.**

No. 02–3468.

United States Court of Appeals,
Sixth Circuit.

Sept. 22, 2003.

Cheryl Kracoff, Robin W. Banister, Norriston, PA, for Petitioner.

Jamie M. Dowd, Emily A. Radford, David V. Bernal, U.S. Department of Justice, Office of Litigation, Washington, DC, for Respondent.

Before MERRITT, MOORE, and GILMAN, Circuit Judges.

MERRITT, Circuit Judge.

Edith Namahoro petitions the Court for review of an order in which the Board of Immigration Appeals affirmed the immi-

gration judge's denial of her claims for asylum and withholding of removal under 8 U.S.C. §§ 1158(a) and 1231(b)(1)(3).[1] The Board held that Namahoro failed to establish that she was a "refugee" from Burundi eligible for asylum or withholding of removal. Because the evidence on the record as a whole does not compel the conclusion that Namahoro was persecuted or has a well-founded fear of persecution in Burundi on account of her race, nationality, membership in a particular social group, or political opinion, the petition for review is DENIED.

The Attorney General has discretion to grant asylum to a person who qualifies as a "refugee" within the meaning of section 101(a)(42)(A) of the Immigration and Nationality Act. *See* 8 U.S.C. § 1158(b)(1). The Act defines a refugee as

> any person who is outside any country of such person's nationality or, in the case of a person having no nationality, is outside any country in which such person last habitually resided, and who is unable or unwilling to return to, and is unable or unwilling to avail himself or herself of the protection of, that country because of persecution or a well-founded fear of persecution on account of race, religion, nationality, membership in a particular social group, or political opinion....

*Id.* § 1101(a)(42)(A). To obtain asylum, an alien must show that she is a refugee and also that she is entitled to asylum. *Mikhailevitch v. INS*, 146 F.3d 384, 389 (6th Cir.1998); *Perkovic v. INS*, 33 F.3d 615, 620 (6th Cir.1994). The asylum applicant bears the burden of establishing refugee status "either because he or she has suffered past persecution or because he or she has a well-founded fear of future per-

secution." 8 C.F.R. § 208.13(b). "Persecution" is not defined in the statute or regulations, but we have held that it encompasses "more than a few isolated incidents of verbal harassment or intimidation, unaccompanied by any physical punishment, infliction of harm, or significant deprivation of liberty." *Mikhailevitch*, 146 F.3d at 390.

"The testimony of the applicant, if credible, may be sufficient to sustain the burden of proof without corroboration." 8 C.F.R. § 208.13(a). However, internally inconsistent testimony or very generalized assertions of fear are not sufficient. *See Wadyal v. INS*, 1991 U.S.App. LEXIS 26445, at *6, 947 F.2d 947, 1991 WL 224111 (6th Cir. Nov. 1, 1991). As we have noted, "fear of retribution over purely personal matters or fear of general conditions of violence and upheaval do not qualify an alien for asylum." *Perkovic*, 33 F.3d at 621 (internal quotation marks omitted). The applicant who satisfies the burden of establishing past persecution is presumed to have a well-founded fear of future persecution. *See Mikhailevitch*, 146 F.3d at 389; 8 C.F.R. § 208.13(b)(1). The applicant who fails to establish that she is a "refugee" under § 1158(a) will necessarily fail to satisfy the more stringent standard governing an application for withholding of removal under § 1231(b)(1)(3). *See INS v. Cardoza–Fonseca*, 480 U.S. 421, 449–50, 107 S.Ct. 1207, 94 L.Ed.2d 434 (1987); *INS v. Stevic*, 467 U.S. 407, 424, 104 S.Ct. 2489, 81 L.Ed.2d 321 (1984); *Koliada v. INS*, 259 F.3d 482, 489 (6th Cir.2001); *Mikhailevitch*, 146 F.3d at 391.

Edith Namahoro testified that she was a 23–year–old native and citizen of Burundi, and that she fled Burundi on May 26, 2001.

---

1. The Board also held that Namahoro is not eligible for relief pursuant to the Convention Against Torture. *See* 8 C.F.R. § 208.16–18. Namahoro does not seek review of that decision.

She testified that she traveled through Rwanda, Uganda, Kenya, Belgium and France, ultimately arriving on August 25, 2001 in Cincinnati with a fraudulent French passport. In her application for asylum, she claimed that she is a member of the Hutu tribe; that her father and mother were killed by the Tutsi ruling party on October 21, 1993 due to their support of the Burundi National Front, the democratic party of Melchoir Ndadaye; that her brother was taken away and never seen again; that after her parents were killed, she was "forced to live in Hutu refugee camps"; that she received written threats that she would be killed if she stayed in the capital among the Tutsi tribe; and that she was arrested in 1998 for "being Hutu"; and that she fears returning to Burundi because she will be tortured, killed, or subject to sexual assaults by Tutsi military soldiers. She did not apply for asylum in any other country, including Belgium and France, despite having lived in Belgium for over two months before taking a bus to Paris.

The record indicates that, in a sworn statement before the Immigration Inspector, Namahoro said that she left Burundi "because the country is in war, my parents are dead, and they destroyed my home." (J.A. at 47.) She also said that she was coming to the United States to look for her fiancé. (J.A. at 48.) At the hearing before the immigration judge, Namahoro testified that her parents were killed by "a soldier" and that she fled Burundi because she and her brothers were persecuted by "soldiers." She testified that she had been arrested in 1998 for throwing rocks at soldiers, held in prison for two days, released, and ultimately pardoned. In response to the question whether she had ever been tortured, she responded "yes," but when asked for details, she vaguely responded that she had "experienced persecution [from] the soldiers." Asked when the persecution took place, Namahoro responded:

> And, and uh, uh, we, uh, we fled, uh, and separated because I was the, uh, that is my brother, or the oldest, excuse me, my brother sent me letters and told me that I should try to leave the country.

(J.A. at 40.) When asked why she could not return to Burundi, Namahoro stated:

> Uh, because, uh, the people who killed, uh, my parents, uh, they killed my parents, they, they stole everything that we had, uh, and as a result of the conventions, uh, in South Africa, uh, they are attempting to, uh, establish, uh, uh, a state of peace, uh, and they said that if I or my brothers return, uh, that we would be, uh, accused, uh.

(J.A. at 41.) At one point, Namahoro testified that she was forced to live in a "refugee camp" for eight months, then changed it to fourteen months, and then she testified that "it wasn't exactly a refugee camp, it was rather, a group of people who collected together at night, uh, uh, to sleep, to gather to form a group, uh, that would sleep, that would sleep elsewhere at night and then during the day would return home." (J.A. at 44.) To explain the discrepancy, she stated, "I spent this time in different places, different camps. Uh, I, I spent this amount of time at the place before my cousin was killed." (Tr. at 46.) When asked if "anything [had] ever happen[ed] to [her] in the refugee camp," she responded, "I can't say." (J.A. at 42.) Although Namahoro testified that she is a member of the Burundi Democratic Front (another apparent basis for her fear of persecution), she was unable to name the current president or leader of that political party. She testified that she still has a brother and a cousin in Burundi, though as noted above, also indicated that her cousin had been killed. She has no family in the United States. Finally, Namahoro provid-

ed no corroborating documents to establish her alleged identity as a native citizen of Burundi, the deaths of her parents at the hands of soldiers, or her time spent at the refugee camp.

The immigration judge found Namahoro's testimony less than credible and concluded that she had failed to establish that she is a refugee eligible for asylum or withholding of removal. The Board of Immigration Appeals affirmed that decision. Under our deferential standard of review, we must uphold the Board's decision if it is "supported by reasonable, substantial, and probative evidence on the record considered as a whole." *Mikhailevitch*, 146 F.3d at 388 (internal quotation marks omitted). Namahoro's petition for review may be granted only if the evidence presented would *compel* a reasonable factfinder to reach a contrary conclusion. *See id.*

Viewing the evidence in the record as a whole, we conclude that a reasonable factfinder would not be compelled to find the requisite persecution or fear of persecution on account of any of the five statutory reasons. Given Namahoro's very vague claims of "torture" and "persecution"; her varying accounts of the forced "refugee camp," including an apparent refusal to say what, if anything, happened to her there; her apparent liberty to attend high school and work in a hotel restaurant; her conflicting statements regarding her reason for fleeing Burundi and her fear of returning; her inability to identify the president of the Burundi Democratic Front; and her conflicting statements regarding her cousin, it was not unreasonable for the immigration judge to find her testimony incredible and to require corroborating evidence regarding her identity and the basis of her fear of persecution. Further undermining her claim is a lack of evidence that her remaining brother has had any problems in Burundi. There is also a reasonable inference that Namahoro is in fact seeking refuge in the United States in order to be with her fiancé. Finally, the U.S. State Department Report on Burundi, to which she refers only generally and which describes the civil unrest and violence as a result of the conflict between the Hutu and the Tutsi tribes, does not compel a different result.

We further agree that the documents presented to the Board by Namahoro on appeal, and which the Board considered despite having no obligation to do so, *see Matter of Haim*, 19 I & N Dec. 641, 1988 WL 235452 (BIA 1988) (noting that the Board reviews only the record before the immigration judge), likewise do not provide evidence compelling a different result. These documents consist of affidavits intended to corroborate her testimony regarding her own identity, her parents' identity, the cause of her parents' deaths, her time spent in a refugee camp, and her reasons for fleeing Burundi. However, they provide no details about why her parents were killed or who killed them. Some of the affidavits refer vaguely to Namahoro's being the subject of an "intense witch hunt" or "manhunt" and threats (J.A. at 145, 153), while others say that she "fled the country following tribal and socio-political problems in the country" (J.A. at 147). None indicates *why* Namahoro was the subject of hunts and threats, which is the foundation of establishing that she was a "refugee" under the Act. We further note that at least one of the affiants swears that Namahoro has "two brothers" remaining in Burundi (*see, e.g.*, J.A. at 145), but she testified before the immigration judge that she only has one brother because the other was beaten to death (*see id.*).

Accordingly, the petition for review is DENIED.