NOT RECOMMENDED FOR FULL-TEXT PUBLICATION
File Name: 07a0866n.06
Filed: December 19, 2007

Case No. 06-3862

UNITED STATES COURT OF APPEALS
FOR THE SIXTH CIRCUIT

| | |
|---|---|
| BI HUA WENG, ) | |
| ) | |
| Petitioner, ) | |
| ) | ON APPEAL FROM THE |
| v. ) | BOARD OF IMMIGRATION |
| ) | APPEALS |
| MICHAEL B. MUKASEY, Attorney ) | |
| General, ) | |
| ) | |
| Respondent. ) | |
| ) | |
| _____ ) | |

BEFORE: MARTIN and BATCHELDER, Circuit Judges; O'MEARA[*], District Judge.

ALICE M. BATCHELDER, Circuit Judge. Petitioner Bi Hua Weng ("Weng") seeks

review of the decision of the Board of Immigration Appeals ("BIA") summarily affirming the

Immigration Judge's ("IJ") denial of Weng's asylum application, request for withholding of removal,

and relief under the Convention Against Torture ("CAT"). Because we conclude that Weng has

demonstrated both that she suffered past persecution due to China's one-child policy, and that she

would be subject to future persecution should she return to China, we **REVERSE** the IJ's decision

that Weng failed to establish eligibility for asylum based on past persecution and **REMAND** the

matter to the IJ for further proceedings consistent with this opinion.

_____

[*]The Honorable John Corbett O'Meara, United States District Judge for the Eastern District of Michigan, sitting
by designation.

## A. FACTUAL BACKGROUND

Weng is a citizen of the People's Republic of China. She is married and she and her husband have three sons, one of whom was born in the United States in 2004; her two other sons and her husband remain in China. Weng entered the United States at Dulles International Airport on December 21, 2003. Currently, Weng lives in Arkansas with her sister and works at her sister's restaurant.

Weng had her first child in June 1994. Later that year, Weng became pregnant with her second child in violation of China's one-child policy. In order to have that child, Weng had to send her first child to live with relatives and she had to bribe an agent of the local "family planning" division of the Chinese government. After the second child was born, the Chinese government forced Weng to have an intrauterine device ("IUD") implanted for birth control purposes. Because Weng was seriously anemic, the IUD caused substantial bleeding and other medical complications. Several years later, after continued complications, Weng had to have the IUD surgically removed. Doctors determined that she could not sustain another IUD at that time and informed her that she had to use contraception if she engaged in any further sexual activity. Weng claims that the contraception failed, and she became pregnant again in May 2003.

Knowing that the Chinese government would force her to abort the third child, Weng decided to flee. She initially went into hiding in China, living with friends in order to avoid the governmentally mandated periodic gynecological exams to determine if a woman is pregnant. Then, after a short time in hiding she began a two-month trek that would eventually bring her to the United States.

On October 15, 2004, a "snakehead"[1] took Weng to a mountainous area, where she stayed for two days. The snakehead then put Weng on a plane, and she began a journey that included several countries — Weng does not know which ones — where she stayed for varying periods of time. It is unclear whether Weng used her own Chinese passport or a different passport for the initial stops, but it appears that she used a forged Japanese passport to enter the United Kingdom, and, ultimately, the United States. Weng gave birth to her third son, Frank, in New York on March 5, 2004. Frank currently lives in New York with Weng's relatives. Weng indicated that, if she must go back to China, Frank would stay in New York with her relatives.

Weng claims that in September 2003, after she went into hiding, village birth control officials went to her house inquiring as to why she had missed her regularly scheduled pregnancy exams. The officials told Weng's husband that the Chinese government would punish Weng if she did not appear for an exam within two months. Weng's husband and second son then fled, and when the birth control officials returned and found Weng's house empty, they tracked down Weng's mother. On February 5, 2004, the birth control officials informed Weng's mother that they were going to lock Weng's house to prevent anyone from accessing it and that they would subject Weng to the "harshest punishment" if she did not attend her pregnancy exam. Weng established these visits and the locking of her house through documents and photographs.

Weng also claims that she is a Christian and that, in China, she belonged to an "underground" church, i.e., a church the Chinese government has not sanctioned and whose congregation meets in secret. Weng claims that because of her membership in this church, police officials seized her,

---

[1]The snakeheads are a Chinese gang that smuggles people to other countries, often the United States and the United Kingdom. Weng's uncle paid the snakeheads approximately $50,000 to get Weng to the United States.

3

interrogated her, shocked her with a baton and slapped her in an attempt to get her to confess to being a member of the underground church, and held her prisoner for 30 hours in September 2002. Her application for asylum, however, does not reference religious persecution, and states that she had never been arrested, imprisoned, or interrogated. Weng presented these issues for the first time in a prepared statement she presented before the IJ.

### B. PROCEDURAL BACKGROUND

On January 31, 2005, Weng appeared before the IJ on her application for asylum, withholding of removal, and relief under the CAT. The IJ denied Weng's application, finding that she was not credible and not eligible for asylum or for any other form of relief. The BIA summarily adopted and affirmed the IJ's decision. Weng then filed a timely petition for review in this Court, contending that the BIA abused its discretion in affirming the IJ's denial of her application. We have jurisdiction pursuant to 8 U.S.C. § 1252(a)(1) which provides for judicial review of all final immigration removal orders.

## II. ASYLUM

When "the [BIA] adopts the decision of the IJ in lieu of issuing its own opinion, we review the IJ's decision as the final agency decision." *Denko v. INS*, 351 F.3d 717, 726 (6th Cir. 2003); *see also* 8 C.F.R. § 1003.1(e)(4)(ii). The Attorney General has delegated authority to the IJ to determine if an alien qualifies as a refugee. *Yu v. Ashcroft*, 364 F.3d 700, 702 (6th Cir. 2004) (citing 8 U.S.C. § 1158(a) & (b)). An IJ fielding a request for asylum must make a two-step inquiry, deciding: (1) whether the applicant qualifies as a refugee as defined in 8 U.S.C. § 1101(a)(42); and (2) if so, whether the applicant merits the IJ's exercising discretion on his or her behalf. *Id*. (citing *Ouda v. INS*, 324 F.3d 445, 451 (6th Cir. 2003)).

4

We review an IJ's finding concerning whether an alien qualifies as a refugee under the substantial evidence test. *Ramani v. Ashcroft*, 378 F.3d 554, 558 (6th Cir. 2004); *see also Mikhailevitch v. INS*, 146 F.3d 384, 388 (6th Cir. 1998) (citing *INS v. Elias-Zacarias*, 502 U.S. 478, 481 (1992)). A refugee is defined as "an alien who is unable or unwilling to return to his home country 'because of persecution or a well-founded fear of persecution on account of race, religion, nationality, membership in a particular social group, or political opinion.'" *Elias-Zacarias*, 502 U.S. at 558 (quoting 8 U.S.C. § 1101(a)(42)(A)). Weng bears the burden of demonstrating that she is a refugee. 8 C.F.R. § 208.13(a).

As an applicant for asylum, Weng must prove that she has suffered past persecution or has a well-founded fear of future persecution should she return to China. *Yu*, 364 F.3d at 703; *see also Perkovic v. INS*, 33 F.3d 615, 620 (6th Cir. 1994). If she satisfies her burden of establishing past persecution, she is entitled to a rebuttable presumption that she has a well-founded fear of future persecution. *See Mikhailevitch*, 146 F.3d at 389. Weng's testimony, if credible, may be sufficient to meet her burden of proof without corroboration. 8 C.F.R. §§ 208.13(a), 208.16(b). "Accordingly, a credibility determination forms the initial consideration in an IJ's asylum claims analysis." *Mapouya v. Gonzales*, 487 F.3d 396, 406 (6th Cir. 2007) (internal citations omitted).

An IJ's credibility determinations are considered findings of fact, which we also review under the substantial evidence test. *Yu*, 364 F.3d at 703. We deem factual findings "conclusive unless any reasonable adjudicator would be compelled to conclude to the contrary." 8 U.S.C. § 1252(b)(4)(B). Thus, we may not reverse the IJ or BIA simply because we would have decided the matter differently. *Mikhailevitch*, 146 F.3d at 388. We may reverse only if the petitioner's evidence compels a conclusion contrary to that of the IJ or BIA. *Elias-Zacarias*, 502 U.S. at 483-84 ("[T]o

5

obtain judicial reversal of the BIA's determination, [the petitioner] must show that the evidence he presented was so compelling that no reasonable finder of fact could fail to find" in the petitioner's favor.).

We afford substantial deference to an adverse credibility finding on issues that go to the heart of the applicant's claims. *Sylla v. INS*, 388 F.3d 924, 926 (6th Cir. 2004). In the case at bar, Weng asserts two separate grounds for asylum. First, she seeks asylum based on religious persecution. Second, she seeks asylum based on her fear that the Chinese birth control officials will forcibly sterilize her if she returns. The IJ found that Weng's claims of persecution were not credible as to either ground.

We turn first to Weng's claim that she was subjected to past persecution. There is no specific definition of persecution in immigration law. *Mikhailevitch*, 146 F.3d at 389. We have held that persecution "requires more than a few isolated incidents of verbal harassment or intimidation, unaccompanied by any physical punishment, infliction of harm, or significant deprivation of liberty." *Id*. at 390. Rather, "persecution is an extreme concept that does not include every sort of treatment our society regards as offensive." *Ali v. Ashcroft*, 366 F.3d 407, 410 (6th Cir. 2004); *Cf. Mikhailevich*, 146 F.3d at 389-90.

Weng did not claim religious persecution in her initial asylum application, which she certified in open court was true and correct, or in her initial interview. Nor did Weng mention on her asylum application the 30-hour interrogation by Chinese police that she claims was a result of her religious affiliation. In fact, she denied ever being detained or interrogated. Moreover, on her asylum application, Weng stated that neither she nor her family belonged to any religious or political organizations. Additionally, the IJ found that Weng's use of a false Japanese passport and her two

6

unsuccessful attempts to enter the United States — both prior to her third pregnancy — cast doubt on her credibility.

We find that the above facts constitute substantial evidence to support the IJ's adverse credibility finding regarding past religious persecution. Certainly, whether Weng has been subjected to persecution based on her religious beliefs goes to the heart of her claim that she is eligible for asylum on this basis. *See Sylla*, 388 F.3d at 926. Therefore, Weng has not established that she suffered past religious persecution, so she is not entitled to the presumption that she has a well-founded fear of such future persecution.

Weng also seeks asylum because of persecution due to China's one-child policy. Specifically, she claims that the IUD insertion constitutes past persecution, and she fears reprisal from the Chinese government because of her failure to report for her governmentally mandated pregnancy exam. The IJ did not make any explicit finding with regard to whether Weng had been subject to past persecution because of China's one-child policy. We now conclude that the record demonstrates that she was.

The International Religious Freedom Act of 1998, wholly contained within 8 U.S.C. § 1101, states:

> For purposes of determinations under this chapter, a person who has been forced to abort a pregnancy or to undergo involuntary sterilization, *or who has been persecuted for failure or refusal to undergo such a procedure or for other resistance to a coercive population control program*, shall be deemed to have been persecuted on account of political opinion, and a person who has a well founded fear that he or she will be forced to undergo such a procedure or subject to persecution for such failure, refusal, or resistance shall be deemed to have a well founded fear of persecution on account of political opinion.

8 U.S.C. § 1101(a)(42)(B) (emphasis added); H.R. Rep. No. 104-469, at 174 (1996).

7

The forced implantation of an IUD is highly objectionable, but governmental actions that our society deems objectionable or offensive do not necessarily rise to the level of persecution. *Ali*, 366 F.3d at 410; *Cf. Mikhailevich*, 146 F.3d at 389-90. In that respect, Weng was not treated differently from the way in which many Chinese women are treated under China's one child policy and the forced implantation of an IUD amounts only to generalized persecution. Generalized persecution, not based on race, religion, nationality, membership in a particular group, or political opinion, does not qualify an alien for asylum. *Perkovic*, 33 F.3d at 621.

The documented actions of the village birth control officials, however, amount to persecution based on political opinion under 8 U.S.C. § 1101(a)(42)(B). After Weng fled, the village birth control officials threatened her husband and mother,[2] saying that they would subject Weng to the "harshest punishment," and locked Weng's house to prevent her family from accessing it. We conclude that the threatened "harshest punishment" means forced sterilization and severe fines. Forced sterilization undoubtedly amounts to persecution. 8 U.S.C. § 1101(a)(42)(B). Moreover, severe economic penalties, including harsh fines, can rise to the level of persecution in extreme situations. *See Berdo v. INS*, 432 F.2d 824, 828 (6th Cir. 1970). Thus, we hold that, because of the ample documentary evidence of the village birth control officials' actions Weng presented before the IJ, she has been subject to past persecution under the applicable definition. Because she has suffered past persecution, we afford Weng the rebuttable presumption that she would be subject to future persecution should she return to China. *See Mikhailevitch*, 146 F.3d at 389. Our conclusion stems from the specific evidence in this case, and not from generalized evidence or reports about the

[2]These threats were made in the context of Weng's failure to appear for mandatory pregnancy examinations, the purpose of which was to discover and/or terminate any unauthorized pregnancy.

8

implementation of China's one-child policy in the Fujian province. *Contrast Xue Ying Lin v. Gonzales*, 203 Fed. Appx. 704, 708 (6th Cir. 2006) (finding that a fear of persecution is not objectively reasonable because there is lax enforcement of the one child policy in the Fujian province).

Our analysis now turns to whether Weng has a well-founded fear of future persecution. The IJ made the explicit finding that Weng had not demonstrated a well-founded fear of future persecution. The well-founded fear-of-persecution analysis contains both a subjective and an objective component. *Pilica v. Ashcroft*, 388 F.3d 941, 950 (6th Cir. 2004). In order to establish the subjective component, the applicant must prove that she "actually fears that [she] will be persecuted upon return to [her] country." *Perkovic*, 33 F.3d at 620-21. The objective component, on the other hand, requires the applicant to establish an "'objective situation' under which [her] fear can be deemed reasonable." *Pilica*, 388 F.3d 950. Thus, the subjective component asks only if the applicant's fear is genuine — whether she actually fears persecution — and the objective component evaluates whether that fear is reasonable. *Lumaj v. Gonzales*, 462 F.3d 574, 578 (6th Cir. 2006) ("The fear of persecution must be both subjectively genuine and objectively reasonable.").

Weng fears that if she returns to China she will be persecuted for being a Christian. But Weng provides virtually no specific basis for her fear of future religious persecution, and we reiterate that the IJ found that claim not credible. Since "the subjective fear component turns largely upon the applicant's own testimony and credibility," *Akhtar v. Gonzales*, 406 F.3d 399, 404 (6th Cir. 2005), Weng has not established that her fear of religious persecution is subjectively genuine, and we need not consider it further.

9

Weng's fear of persecution by the birth control officials is another matter. Because we found that she was subject to past persecution, we afford her the rebuttable presumption that she would be subject to future persecution if she returns to China. *See Mikhailevitch*, 146 F.3d at 389. The presumption of persecution can be rebutted if the IJ finds by a preponderance of the evidence that there has been "a fundamental change in circumstances such that the applicant no longer has a well-founded fear of future persecution" or if the IJ finds that the applicant could reasonably move to another part of her country and avoid future persecution. 8 C.F.R. § 208.13(b)(1)(i)(A)-(B); *See also Abay v. Ashcroft*, 368 F.3d 634, 637 (6th Cir. 2004).

The IJ reasoned that because Weng had sent her first child to be cared for by relatives and bribed a family-planning official in order to deliver her second child; had left the second child with her husband in China and fled to the United States in order to have her third child; and has indicated that she would leave her third child, a United States citizen, in the United States if she is forced to return to China, Weng cannot show that the Chinese authorities know that she is in violation of the one-child policy, and therefore Weng cannot show that she is actually in danger of being forcibly sterilized should she be sent back. In short, the IJ, held:

> As cold as it sounds, the respondent was willing to send one child off in China and it appears that she is willing to abandon another child in the United States. The evidence does not exist to prove that the respondent would bring this child with her to China and so have proof and be shown to be in violation of the family planning laws of China.

We find the IJ's conclusions troubling. It is clear from this record that Weng was willing to "send one child off in China" in order to avoid a forced abortion of her second child, and that Weng's fear of forced sterilization stems from the authorities' knowing of the birth of her second child, knowing that she had wholly failed to report for the periodic gynecological examinations the

10

government required to ensure that she was not pregnant and could not become so, and threatening sterilization as a consequence. Weng's statements in that regard are not refuted anywhere in the record.

But the IJ also found that "[b]ackground material show [sic] that the Chinese government continues to enforce the one child policy in Fujian Province with some degree of latitude," and that "respondent has not proven that it is more likely than not that she would undergo [forced sterilization] especially since the family planning officials did not know she was pregnant when she left China." It is the purview of the BIA, or the IJ in this instance, to determine the current conditions prevailing in a particular country. *INS v. Ventura*, 537 U.S. 12, 16-18 (2002). We can only overturn such a determination if a rational adjudicator, looking at the record as a whole, would be compelled to conclude to the contrary. *See* 8 U.S.C. § 1252(b)(4)(B). Furthermore, we note that this circuit has held, with regard to this same province in China, but with regard to an alien who had never been the object of specific threats such as Weng has experienced, that "a rational adjudicator could consider all of the information available on family planning in Fujian, find that the one consistent theme is the lax enforcement of any formal policies, and conclude that the probability of forced sterilization for any Chinese national returning to Fujian is low." *Lin*, 203 Fed. Appx. at 708.

There is no evidence to suggest that the situation has changed with regard to Weng. That is, there is no definitive evidence to suggest that the birth control officials will not harshly punish Weng for her violations of the one-child policy. On the other hand, although we have found that the one-child policy is not strictly enforced in the Fujian province, *see Lin*, 203 Fed. Appx. at 708, the Second Circuit has found that, in fact, the policy in the Fujian province is just the opposite. *See, e.g.*, *Shou Yung Guo v. Gonzales*, 463 F.3d 109, 113, 115 (2d Cir. 2006) (citing a report by the Fujian

11

Family-Planning Administration stating that women who have children abroad in violation of China's one-child policy will "be subject to family planning enforcement upon resettlement in China."); *Tian Ming Lin v. United States Dep't of Justice*, 468 F.3d 167, 168 (2d Cir. 2006) (concluding that documents suggest that there may be a policy of forced sterilization in the Fujian province); *Xia Hua dong v. Gonzales*, 2007 U.S. App. LEXIS 2363 (2d Cir. 2007). The IJ has not rebutted the presumption here: the conflicting evidence about the status of enforcement of the one-child policy in the Fujian province, together with the documentary evidence that Weng presented specific to her case, compel the conclusion that Weng has a well-founded fear of future persecution. Therefore, Weng qualifies as a "refugee" under 8 U.S.C. § 1101(a)(42).

The IJ further held that, even if he had found Weng to be fully credible, he would not find that she warranted an exercise of discretion in her favor. The Attorney General, and through him the IJ, is entitled to use his discretion, and is *not required,* to grant asylum to every alien who meets the definition of refugee. *Cardoza-Fonseca*, 480 U.S. at 428, fn.5. This discretionary judgment is "conclusive unless manifestly contrary to the law and an abuse of discretion." *Yu*, 364 F.3d at 703 (quoting 8 U.S.C. § 1252(b)(4)(D)). Having concluded that Weng is eligible for asylum, we remand this matter to the IJ for a specific determination of whether Weng should be granted that discretionary relief.

## III. WITHHOLDING OF REMOVAL

An applicant seeking a withholding of removal has to meet a more stringent burden of proof than does an applicant for asylum. *Mikhailevitch*, 146 F.3d at 391 (citing *INS v. Cardoza-Fonseca*, 480 U.S. 421, 431-32 (1987)). In order to qualify for withholding of removal, Weng must establish that there is a clear probability the she would be subjected to persecution if she returns to China. *Id*.

12

(internal citations omitted). We have concluded that substantial evidence supports the IJ's decision that Weng is ineligible for asylum because of religious persecution. Therefore, *a fortiori*, she "cannot satisfy the more stringent standard for withholding of" removal regarding religious persecution. *Id*. On the other hand, we have determined that Weng is eligible for asylum because of the persecution by the birth control officials. Consequently, on remand the IJ should consider whether Weng is entitled to withholding of removal based on all the evidence in the record regarding the application of the one-child policy against Weng.

## IV. CONVENTION AGAINST TORTURE

In order to establish entitlement for relief on her CAT claim, Weng must prove "that it is more likely than not that [she] would be tortured if" removed to China. *Singh v. Ashcroft*, 398 F.3d 396, 404 (6th Cir. 2005) (citing *Pilica*, 388 F.3d at 951 (quoting 8 C.F.R. § 208.16(c)(2))). The IJ found, and we agree, that forced sterilization, under the circumstances of this case, would constitute torture. We need not decide whether it is more likely than not that Weng would be sterilized if she returns to China because we have already decided that she is eligible for asylum based on her well-founded fear of sterilization.

## V. CONCLUSION

For the foregoing reasons, we **REVERSE** the decision of the IJ that Weng failed to establish eligibility for asylum on the basis of past persecution. We **REMAND** the matter to the IJ for a determination of whether Weng is entitled to a discretionary grant of asylum and/or withholding of removal in light of all the evidence on the record.