NOT RECOMMENDED FOR FULL-TEXT PUBLICATION
File Name: 06a0657n.06
Filed: August 29, 2006

No. 05-3865
UNITED STATES COURT OF APPEALS
FOR THE SIXTH CIRCUIT

| | |
|---|---|
| **MARSEL BITANJI,** *et al.*, | ) |
| | ) |
| **Petitioners,** | ) |
| | ) |
| **v.** | ) **ON APPEAL FROM THE** |
| | ) **BOARD OF IMMIGRATION** |
| **ALBERTO R. GONZALES,** | ) **APPEALS** |
| | ) |
| **Respondent.** | ) |

**BEFORE: GIBBONS and MERRITT, Circuit Judges; O'MEARA, District Judge.**[*]

**JOHN CORBETT O'MEARA, District Judge.** Marsel Bitanji ("Bitanji"), his wife,

Anila Kola ("Kola"), and their daughter, Bruna Bitanji ("Bruna"), (collectively "Petitioners")

petition for review of a decision by the Board of Immigration Appeals ("BIA") that adopted and

affirmed an immigration judge's ("IJ") denial of their applications for asylum, withholding of

removal, and protection under the United Nations Convention Against Torture ("CAT"). F or

the reasons set forth below, we affirm the orders of the BIA.

**BACKGROUND FACTS**

Petitioners Bitanji, Kola, and Bruna entered the United States from Albania on December

8, 2000. Bitanji, now 30, says he had been suffering political persecution in Albania since he

was 15 and that as a result of his support of opposition government forces, he fears for his life

and the lives of his family members.

---

[*] The Honorable John Corbett O'Meara, United States District Court for the Eastern District
of Michigan, sitting by designation.

In his asylum application, Bitanji claims to have been arrested and maltreated by the Albanian police four times between 1990 and 1998. The first incident, on December 14, 1990, followed his participation in a protest against the communist government in the city of Shkoder. During his 24-hour detention, he was allegedly beaten "by five policemen with batons and wires and metal objects," which left him in need of a one-night hospital stay for the treatment of back injuries.

Bitanji says he was arrested, beaten and detained two more times within the next year, once in April 1991, and again in May 1991. After his third arrest, Bitanji says he retired from street demonstrations but continued to work underground. In particular, he started assisting a group called "13 Dhjetor 1990" (December 13, 1990), also known as The Anticommunist Political Society. When the Democratic Party won the Albanian elections in 1992, Bitanji says his political persecution temporarily ended. In April 1997, Bitanji and Kola moved to Greece, where he worked as a driver.

During the next three years, Bitanji claims to have returned to Albania only once. It was on this trip that he says his fourth run-in with the police occurred. "Walking from one bus station to another in Tirana," Bitanji says he was arrested and interrogated about the rallies that had occurred in the city after the death of the local leader of the Democratic Party. Bitanji claims the police beat him with rubber batons and held him for 48 hours.

Shortly after his family's return to Albania in August 2000, Bitanji says he began planning a party for Bruna's third birthday on October 8, 2000. Three days before the event was to occur, Bitanji says his friend told him that "during the party, masked socialist policeman [sic]

were going to kidnap [his] daughter in order to 'give [him] a lesson' for [his] support to groups opposing the Socialist Government." Bitanji canceled the party and made plans to leave Albania. On December 8, 2000, he and his family crossed the U.S. border in Texas near Brownsville.

In their application for asylum, the Bitanjis submitted their passports and additional paperwork aimed at corroborating their story. They also testified, along with Kola's mother, in front of Immigration Judge Robert D. Newberry at a June 23, 2004 hearing.

Credibility problems emerged immediately. The passports indicated that Bitanji had made at least five trips from Greece to Albania and back after he left the country in 1997. Asked why he said in his asylum application that he had returned only once, Bitanji said he could not explain the additional stamps. Kola, under a similar line of questioning, offered that the surplus stamps on her passport were "stamped by the people who brought [them] here to cover themselves."

The United States also questioned Bitanji's accounts of his detainments and beatings. Regarding the December 1990 incident, for instance, Bitanji noted under cross-examination that the police had broken his arm during his detention. Asked why he had mentioned only a bad back in his application, Bitanji first noted that he "didn't know if for sure that [his] arm was broken," and then later that his account of the arm injury was probably lost in translation. "In the, probably in the application," he said, "that doesn't mention everything that I said from my mouth because it was in through telephone." Bitanji did produce hospital records indicating that his arm had been broken in December of 1990. The records were dated November 30, 2002.

Under cross-examination, Bitanji also claimed that he had been hospitalized following the May 1991 incident with the police. Asked why he could not produce hospital records to verify his hospitalization, Bitanji said "[T]here were other people in the hospital and I don't know who kept the records." Similarly, Bitanji could not explain why he had indicated in his application that he was simply walking from one bus station to another during the alleged 1998 incident with the police, while his testimony suggested that he had joined a rally immediately prior to his arrest.

As for the plot to kidnap his young daughter, Petitioners offered a one-page affidavit from Mal Cekini, Bitanji's friend and informant, as evidence of the plot's political underpinnings. Cekini, who belonged to "2 Prill 1991," an anti-Communist association of which Bitanji was not a member, says he learned of the plot from the "[a]ssociation's section in charge of security and protection of its members." Cekini did not supply any specific details of political retribution, noting only that "[t]hese methods are known and exercised several times toward members of family persons who oppose the government in power. . ." After learning of the plot, Bitanji says he went into hiding, though he continued to work as the manager of his brother's local restaurant during this time.

Both parties submitted Country Reports from the U.S. Department of State in support of their positions. While the documents suggest that the Albanian police are "often unreliable" and sometimes abusive, the climate is stable and there is no evidence of persecution of citizens for political reasons. In addition, although there is trafficking in women and children, most instances occur in the 14- to17-year-old age group.

Based on the testimony, as well as the supporting documents, the IJ found Petitioners lacked credibility. Even assuming their stories to be true, the IJ did not believe that their treatment rose to the level of past persecution or that they had a well-founded fear of future persecution. He denied their request for asylum, withholding of removal, and relief under CAT on January 26, 2004.

The Bitanjis appealed to the BIA, where, on June 1, 2005, a panel consisting of a single board member adopted and affirmed the decision of the IJ. On June 30, 2005, Petitioners filed their timely appeal to this court.

## DISCUSSION

## 1. CREDIBILITY OF PETITIONERS' CLAIMS

Petitioners contend that, contrary to the rulings of the BIA and IJ, they have credibly established their eligibility to remain in the country. In determining the merits of removal appeals, this court reviews the final agency determination. See 8 U.S.C. § 1252(a)(1). Where the BIA adopts the reasoning of the IJ, the court may treat the adopted parts of the IJ's decision as the final agency determination. See Denko v. INS, 351 F.3d 717, 723 (6th Cir. 2003).

The standard of review in deportation cases is whether substantial evidence supports the agency decision. See INS v. Elias-Zacarias, 502 U.S. 478, 481 (1992); see also Yu v. Ashcroft, 364 F.3d 700, 703 n.2 (6th Cir. 2004). This highly deferential standard was codified by 8 U.S.C. § 1252(b)(4)(B), which states, "[T]he administrative findings of fact are conclusive unless any reasonable adjudicator would be compelled to conclude the contrary." This court has noted that

5

it "may not reverse the Board's determination simply because [it] would have decided the matter differently." Koliada v. INS, 259 F.3d 482, 486 (6th Cir. 2001) (citation omitted).

To qualify for asylum under the Immigration and Naturalization Act, an alien must establish that he is a "refugee." 8 U.S.C. § 1158(b)(1)(A). A refugee is a person who is unable or unwilling to return to his or her country "because of persecution or a well-founded fear of persecution on account of race, religion, nationality, membership in a particular social group, or political opinion." 8 U.S.C. § 1101(a)(42)(A). The burden of proof is on the applicant to demonstrate that he has suffered persecution or has a well-founded fear of future persecution, *i.e.*, a reasonable person in his "objective situation" would fear persecution. Id.; see also Perkovic v. INS, 33 F.3d 615, 620-21 (6th Cir. 1994). If the alien establishes past persecution, a rebuttable presumption of future persecution arises. The government may rebut that presumption if the evidence suggests that the alien no longer faces a likelihood of persecution or may avoid persecution by moving within his country. 8 C.F.R. § 1208.13(b)(1)(I).

In evaluating the credibility of the applicant's case for asylum, the IJ must consider a number of factors, including,

> the inherent plausibility of the applicant's or witness's account, the consistency between the applicant's or witness's written and oral statements, . . . the internal consistency of each such statement, the consistency of such statements with other evidence of record (including the reports of the Department of State on country conditions), and any inaccuracies or falsehoods in such statements . . .

8 U.S.C. § 1158(b)(1)(B). An alien's own testimony may be sufficient to establish persecution, but only "'where the testimony is believable, consistent, and sufficiently detailed to provide a

plausible and coherent account of the basis for his fear.'" Perkovic, 33 F.3d at 21 (citation omitted).

To qualify for withholding of removal, an alien must demonstrate that there is a "clear probability of persecution." Gumbol v. INS, 815 F.2d 406, 411 (6th Cir. 1987). This standard is stricter than the "well-founded fear" required of asylum applicants. INS v. Cardoza-Fonseca, 480 U.S. 421, 430-31 (1987). Thus, petitioners who fail to meet the burden of proof for asylum will also fail on their appeal for withholding of removal. Mikhailevitch v. INS, 146 F.3d 384, 391 (6th Cir. 1998). To qualify for relief under CAT, the alien must "establish that it is more likely than not that he or she would be tortured if removed to the proposed country of removal." Ali v. Reno, 237 F.3d 591, 596 (6th Cir. 2001) (quoting 8 C.F.R. 208.1(c)(2)).

Because the BIA adopted the reasoning of the IJ, this court reviews the IJ's decision. After considering the Bitanjis' testimony and asylum applications, the IJ found numerous inconsistencies in the record and noted that, even if the testimony were credible, the situation does not give rise to a well-founded fear of persecution or the likelihood of torture. Given this analysis, the IJ (and thus the BIA) did not err in deciding that the Petitioners lacked credibility. He made a reasonable and well supported determination based on the inconsistencies in the Bitanjis' stories and the State Department's assessment of the situation in Albania. There is nothing in the record compelling this court to reverse.

**7**

**2. DUE PROCESS**

Recent streamlining of the BIA review process allows single members of the Board to issue brief orders in cases not suitable for affirmance without opinion or a full written opinion separate from that of the IJ below. 8 C.F.R. § 1003.1(e)(5). Petitioners argue that this streamlining robbed them of *de novo* review and thus violates due process. Using rather colorful language,[1] they contend that single-member panels and BIA opinions adopting the reasoning of IJs will lead "to a slippery slope of the elimination of a fair review of administrative procedures."

We review *de novo* claims of due-process violations in deportation cases. Denko, 351 F.3d at 726 (citation omitted). This court recently affirmed the constitutionality of single-member review, noting that "the BIA's streamlining procedures do not themselves alone violate an alien's rights to due process." Id. at 730. When the BIA adopts the reasoning of the immigration judge, "we are not forced to guess at the rationale of the [Board], but instead we evaluate the [IJ's] explanation as that of the Board." Denko, 351 F.3d at 730. It is the burden of the Petitioners then to prove that the streamlined procedure resulted in insufficient review of their appeal. Id. at 728.

While Petitioners are correct to insist on a fair review, see Reno v. Flores, 507 U.S. 292, 306 (1993), the record indicates that they have received one. As noted, recent changes to the immigration appeals process, deemed constitutional by this court, explicitly allow for the sort of

---

[1] In their brief supporting their appeal to this court, Petitioners write, "It is amazing to see Orwell's horrific vision of the future being implemented before our very eyes."

streamlined review that occurred in this case. Further, the BIA's opinion, though brief and issued by only one Board member, signals consideration of the IJ's reasoning. The Board wrote, "We find that the numerous inconsistencies and discrepancies highlighted in the Immigration Judge's decision were actually present in the record and provided ample basis to doubt the veracity of the lead respondent's claims." While the BIA did not expound on the IJ's reasoning, it was in no way required to do so. In determining whether the Petitioners' appeal has merit, this court may avail itself of the full scope of the IJ's decision, which was properly reasoned and issued. Thus, the Bitanjis have not presented sufficient basis for a finding that their due process rights have been abridged in any way.

For all of these reasons, the BIA's orders are **AFFIRMED.**