NOT RECOMMENDED FOR FULL-TEXT PUBLICATION
File Name: 09a0468n.06

No. 07-4545

UNITED STATES COURT OF APPEALS
FOR THE SIXTH CIRCUIT

**FILED**

**Jul 08, 2009**

LEONARD GREEN, Clerk

MAUREEN JACOBS and TREVOR
ANTHONY JACOBS,

    Petitioners,

v.

ERIC H. HOLDER, JR., Attorney General,

    Respondent.

                      /

ON PETITION FOR REVIEW FROM A
DECISION OF THE BOARD OF
IMMIGRATION APPEALS

BEFORE:    COLE and CLAY, Circuit Judges; and CLELAND, District Judge.[*]

    **CLAY, Circuit Judge.** Petitioners, Maureen Jacobs, as lead petitioner, and her husband, Trevor Anthony Jacobs, as a derivative petitioner, seek review of an order of the Board of Immigration Appeals ("BIA") upholding the denial of the lead petitioner's application for asylum pursuant to § 208 of the Immigration and Nationality Act ("INA"), 8 U.S.C. § 1158, withholding of removal pursuant to § 241(b)(3) of the INA, 8 U.S.C. § 1231(b)(3), and protection under the Convention Against Torture ("CAT"). The immigration judge ("IJ") denied the application on several grounds, including Petitioners' failure to produce corroborating evidence. Petitioners appealed to the BIA. The BIA dismissed the appeal, agreeing with the IJ that Petitioners failed to

    [*]The Honorable Robert H. Cleland, United States District Judge for the Eastern District of Michigan, sitting by designation.

1

sufficiently corroborate their claims because Petitioners failed to submit documents that were reasonably available to them. For the reasons set forth below, we **DENY** the petition for review.

## I. BACKGROUND

### A. Factual Background

Maureen Jacobs, the lead petitioner, is a native and citizen of South Africa, and is married to Trevor Jacobs, a native and citizen of Namibia. On January 24, 2000, Maureen entered the United States through Detroit, Michigan on a J-2 visa. Approximately one year later, on January 21, 2001, Maureen filed an application for asylum, listing her husband, Trevor, as a derivative beneficiary. Maureen claimed that she feared returning to South Africa because she believed that she would be subjected to torture based on her membership in Mapogo-a-Mathamaga ("Mapogo"). She also alleged that she had suffered "harassment, intimidation, and rape" because she was a "white, Afrikaner woman." (J.A. 881.)

In her asylum application and during the removal hearing, Maureen claimed that she suffered persecution because of her membership in Mapogo. Petitioners described Mapogo as a group of citizens coming together to "give protection to the citizens" against criminal activity because of the inability of the police to protect them. (J.A. 161.) Maureen testified that she and her husband joined in February 1999 and received leopard head bumper stickers for their cars and home to indicate that they were members of Mapogo. According to Maureen, the African National Congress ("ANC"), the controlling political party in South Africa, is hostile to Mapogo. Maureen also claimed that she was the target of violence because she was a white woman, and that the police were unable to protect her from the rape and violence committed against white women in South Africa.

2

During the removal hearing, Maureen testified to three specific incidents in support of her application for asylum, withholding of removal, and request for relief under the CAT. The first incident of violence she described occurred in August 1999. Maureen testified that as she entered the store on a shopping trip, a man blocked her way. According to Maureen, he was waving a cigarette in her face and "[h]e got very aggressive" and was "cursing" at her. (J.A. 162.) She stated that she "saw two men standing just behind his back" and, when she attempted to back away from the man with the cigarette, she noticed "three men . . . standing at [her] back with their arms over their chest and . . . laughing." Maureen indicated that she felt "threatened." (J.A. 163.) She testified that "the man grabbed me by my arm and he placed the burning cigarette on my lip and he was burning me and he was shouting . . . . go and tell your Mapago [sic] husband that we will come and get him." (J.A. 165.)

Maureen then went home to wait for her husband to return from work and, when he arrived, she told him what had happened. She testified that Trevor "immediately . . . called the police . . . and the police asked him if there was any witnesses or do we know the people and we said we did not know the people and there wasn't any witnesses and then the police just say that if we don't have witnesses, then we cannot make a case . . . ." (J.A. 166.) Maureen said that the police refused to make a report.

The second incident allegedly occurred on September 15, 1999. According to Maureen, Sarah, "a black woman whom [they] knew," visited their home and told them that "several black men were coming to [their] home" to kill them. (J.A. 203.) Petitioners testified that Trevor asked Maureen to leave the house and stay with a friend, Alta Vanderwalt, and to call the police. As the mob approached Petitioners' home, the men threatened to "kill all Mapogo members and tear down

3

all Mapogo member homes." (J.A. 892.) Before the mob attacked their home, however, Petitioners claimed that Mapogo members arrived and spoke with the mob, eventually convincing them to leave. Petitioners stated that the police never arrived at their home.

Finally, Maureen described a third incident of violence she claims occurred while she was living in South Africa. On January 7, 2000, Maureen was driving to a friend's house, and claims she noticed a white car tailgating her car. She stated that, although she slowed down to let the car pass her, it did not, and instead continued to follow her. Maureen claimed that when she arrived at the dirt road leading to her friend's house, she had to slow down to make a turn and, when she turned, dust surrounded her car and the engine stopped. According to Maureen, the men in the car following her surrounded the car and began shaking it. Maureen stated that the men broke the window, dragged her out of the car, and told her that they wanted to "teach [her] husband a lesson." (J.A. 893.) In addition, they called her a "white Mapago [sic] dog's wife," (J.A. 218), and were "shouting in [her] face that . . . they were from the ANC . . . . [and] [t]hey will do whatever they want and nobody will stop them not even the Mapagos [sic]" (J.A. 219). She testified that each of the men then raped her. Maureen stated that she did not tell anyone about the rape until she arrived in the United States, and feared going to the police or a hospital because her attackers had told her that they would slit her throat if she went to the police. Maureen also testified that she feared that she had contracted HIV as a result of the rape, given the high rate of infection in South Africa. After arriving in the United States, Maureen took two HIV tests, both of which indicated that she does not have HIV.

B.    **Procedural History**

4

On September 4, 2001, the INS issued a Notice to Appear to both Maureen and Trevor, alleging that they were removable pursuant to § 237(a)(1)(B) of the INA because they overstayed a non-immigrant visa. Petitioners appeared before an immigration judge in Detroit, Michigan, and conceded removability. When Petitioners declined to designate a country of removal, the court designated South Africa as the country of removal for Maureen, and Namibia as the country of removal for Trevor.

The IJ held a removal hearing on July 25, 2005, during which Maureen and Trevor testified. At the conclusion of the hearing, the IJ denied Maureen's application for asylum, withholding of removal, and protection under the CAT. The IJ found that Petitioners were not credible, and also concluded that Petitioners failed to corroborate the claims in the asylum application. In particular, the IJ cited the absence of police reports, medical records, and evidence of Petitioners' membership in Mapogo, concluding that there was an "absolute lack of corroborative evidence." (J.A. 763.) The IJ also found that Maureen could not establish that she suffered persecution based on a protected ground, and that Maureen further failed to demonstrate that she could not return to a different region of South Africa.

Petitioners appealed to the BIA, which affirmed. The BIA issued a separate opinion, agreeing with the IJ that Petitioners did not meet their burden of proof for asylum. Specifically, the BIA agreed with the IJ that Petitioners failed to produce "documents that were reasonably available . . . and . . . failed to sufficiently explain their absence." (J.A. 2.) Petitioners now seek review of the BIA's decision.

## II.    THE BIA'S DECISION THAT PETITIONERS FAILED TO MEET THEIR BURDEN OF PROOF BASED ON THE LACK OF CORROBORATING EVIDENCE IS SUPPORTED BY SUBSTANTIAL EVIDENCE

**A.     Standard of Review**

In reviewing the IJ's decision, the BIA declined to summarily affirm. Instead, the BIA issued a separate opinion. Under these circumstances, this Court "review[s] the BIA's decision as the final agency determination." *Khalili v. Holder*, 557 F.3d 429, 435 (6th Cir. 2009). "To the extent the BIA adopted the immigration judge's reasoning, however, this Court also reviews the immigration judge's decision." *Id.* We review the legal conclusions of the BIA de novo, and review factual findings under the substantial evidence standard. *Zoarab v. Mukasey*, 524 F.3d 777, 780 (6th Cir. 2008).

In the context of the BIA's finding that certain corroborating documentation was available to Petitioners, "[n]o court shall reverse a determination made by a trier of fact with respect to the availability of corroborating evidence . . . unless the court finds . . . that a reasonable trier of fact is compelled to conclude that such corroborating evidence is unavailable." *Shkabari v. Gonzales*, 427 F.3d 324, 331 n.2 (quoting Real ID Act of 2005, Pub. L. No. 109-13, § 101(e), 119 Stat. 231, 305 (2005)). Accordingly, in order to reverse the BIA's factual determinations, this Court "must find that 'the evidence not only supports a contrary conclusion, but indeed *compels* it.'" *Dorosh v. Ashcroft*, 398 F.3d 379, 381 (6th Cir. 2004) (quoting *Klawitter v. INS*, 970 F.2d 149, 152 (6th Cir. 1992)).

**B.     Agency Decision**

The IJ concluded that Petitioners had not met their burden of proof for asylum or withholding of removal in part based on the failure to produce corroborating evidence. The IJ found that there was an "absolute lack of corroborative evidence," and that "[i]t would not be unreasonable at all for [the court] to have expected such corroborative evidence." (J.A. 763.) More specifically, the immigration judge found that Petitioners had failed to present any evidence that they were members

6

of Mapogo. Although Petitioners testified that Trevor's brother was unable to obtain an original document proving their membership in Mapogo, the IJ found that "th[e] record [was] devoid of any supporting statement to substantiate the . . . claim that this brother made attempts to get their original membership documents . . . from the Mapago [sic] organization, but was unable to do so." (J.A. 766.) The IJ also noted the absence of "any statement from [Trevor's] brother indicating that he failed or was unable to get such original membership documents." (J.A. 766-67.) According to the IJ, "[n]o attempts were apparently made by [Petitioners] to contact the Mapago [sic] association which clearly has a web site which even lists telephone numbers at which you can contact them." (J.A. 772.) In addition, the IJ's oral decision noted the lack of "any supporting statements from any fellow members of the Mapago [sic] organization." (J.A. 770.)

Additionally, the IJ faulted Petitioners for failing to submit evidence corroborating the claim that Maureen was attacked. Although recognizing that information relating to Maureen's HIV tests was "highly sensitive," the IJ nonetheless found that the medical records could "corroborate her concern over obtaining such a virus" as a result of the rape. (J.A. 768.) The IJ also noted the lack of "any documents indicating that [Maureen] obtained any medical treatment whatsoever as a result of any attack/rape." (J.A. 770.) Further, the IJ believed that Petitioners could have obtained police reports documenting the attack on Maureen, and that their explanation for failing to do so was inadequate. Finally, the IJ concluded that Petitioners should have submitted statements from neighbors who knew of the "incident" on September 15, 1999, in which Petitioners learned that "a mob was on their way to kill them." (J.A. 770.)

On appeal from the IJ's decision, the BIA agreed with the IJ that Petitioners failed to sufficiently corroborate their claim:

7

Despite [having more than one year to collect and submit corroborating documents], the respondents failed to submit any evidence corroborating their membership with Mapago [sic], [Maureen]'s HIV tests, a police report of the 1999 alleged attack on [Maureen], or statements from [Trevor]'s brother . . . or Petitioners' neighbors. . . . [C]orroboration of the fact that the two were Mapago [sic] members could have been easily obtained considering that the group has a web page with contact information. We further note that a statement from the lead respondent's brother-in-law was reasonably available considering that he supplied the respondents with the Mapago [sic] membership "application." . . . . Inasmuch as the Immigration Judge's lack of corroboration finding rests upon a lack of documents that were reasonably available to the respondents and the respondents have failed to sufficiently explain their absence, we will agree with the Immigration Judge that the respondents failed to meet their burden of proof for asylum.

(J.A. 2.)

## C.  Analysis

The BIA rejected Petitioners' asylum application because Petitioners offered no evidence beyond their testimony to corroborate their claims. Under agency regulations, "[t]he testimony of the applicant, if credible, may be sufficient to sustain the burden of proof without corroboration." 8 C.F.R. § 208.13(a). Nonetheless, "even when an applicant's credibility has not been questioned, the failure to provide reasonably available corroborating evidence" can constitute grounds for concluding that an applicant has failed to meet the burden of proof. *Shkabari*, 427 F.3d at 331. The "corroboration rule," however, does not require an applicant to provide supporting documentation unless "it 'is of the type that would normally be created or available in the particular country and is accessible to the alien, such as through friends, relatives, or co-workers.'" *Dorosh*, 398 F.3d at 382-83 (quoting *Perkovic v. INS*, 33 F.3d 615 (6th Cir. 1994)). Consequently, "where an alien's testimony is the only evidence available, it can suffice where [it] is believable, consistent, and sufficiently detailed." *Dorosh*, 398 F.3d at 382. "However, . . . where it is reasonable to expect

corroborating evidence for certain alleged facts pertaining to the specifics of an applicant's claim, such evidence should be provided." *Id.* (citation omitted).

We conclude that the BIA's decision is supported by substantial evidence because Petitioners failed to submit evidence that normally would be available and accessible, "such as through friends, relatives, or co-workers." *Id.* at 383. In dismissing Petitioners' appeal, the BIA first focused on Petitioners' failure to submit evidence—such as membership forms or statements from family members and friends—corroborating the claim that they were members of Mapogo. Petitioners testified that Trevor's brother, Gavin, attempted to get a copy of the actual membership form that Maureen and Trevor submitted to Mapogo to become members. According to Maureen, however, Gavin was unsuccessful because "[i]t is very difficult in South Africa . . . to get original documents." (J.A. 229.) Maureen also testified that they did not receive documentation of their membership in Mapogo because "the Mapago [sic] people in South Africa are not well equipped like here in the United States." (J.A. 199.) Similarly, Trevor stated that they did not receive any evidence of their membership in Mapogo or identification cards, but, instead, received stickers for their homes and cars to prove that they were members. Trevor also testified that, "to [his brother]'s knowledge, they don't keep file of [membership papers]." (J.A. 244.)

Petitioners' testimony suggests that Mapogo membership documents might not "be created or available" in South Africa. *See Dorosh*, 398 F.3d at 383. However, even if Mapogo did not maintain membership records and refused to provide Trevor's brother with evidence of Petitioners' membership in Mapogo, Petitioners failed to produce any evidence that they attempted to secure the documents from Mapogo—Trevor testified that he did not even attempt to contact Mapogo. *See*

9

*Shkabari*, 427 F.3d at 331 ("Even if the doctor was still unavailable, Mrs. Shkabari did not present any evidence in the forms of letters or envelopes that she had tried to retrieve her files . . . .").

Petitioners also failed to adequately explain the absence of such corroborating evidence. When questioned as to why she did not obtain "an affidavit or documentation verifying that [Gavin] attempted documentation from the Mapago [sic] verifying your membership and was unable to do so," Maureen answered that she "didn't know that [she could] do that." (J.A. 201.) With respect to statements from family and friends who knew of their membership in Mapogo, Maureen testified that she did not obtain statements verifying that she and her husband were members of Mapogo because she "thought the only documentation direct from Mapago [sic] the headquarters, I thought that is the documentation that the court or my lawyer wanted." (J.A. 200.) The record does not compel, as it must to overturn the BIA's findings, the conclusion that such evidence was unavailable to Petitioners at the time Maureen submitted her asylum application.

The BIA also cited Petitioners' failure to submit statements from neighbors confirming the mob's alleged attack against them on September 15, 1999, and concluded that those documents were available and accessible to Petitioners. During the removal hearing, Maureen explained that she could not secure a statement from Sarah, the woman who alerted them to the attack, because Sarah could not read or write and did not have a telephone. Maureen also testified that she did not know of anyone in the area who could help Sarah write a statement. However, in explaining the absence of affidavits or statements from other potential witnesses, Maureen stated only that her "lawyer did not tell [her] to get information . . . and [she] never kn[e]w that the Court w[ould] see it." (J.A. 223.) Maureen then stated: "If I knew it, I would get that information." (*Id.*) Maureen's testimony thus

10

suggests that she could have obtained the statements, but did not because she was unaware that they could be used to support her asylum application.

This Court addressed a similar set of facts in *Liti v. Gonzales*, 411 F.3d 631 (6th Cir. 2005). In *Liti*, the court agreed with the BIA that "corroborating evidence was reasonably available to the Litis, yet not provided." *Id.* at 640. The court found that "though they have family members still living in Albania, the Litis failed to provide any affidavits in support of their claim of persecution . . . . [T]hough Liti is in frequent contact with his brother, . . . the Litis failed to provide an affidavit . . . to bolster their claims of a well-founded fear of political persecution." *Id.* Similarly, Petitioners were in contact with Trevor's brother and also had friends and family who continued to live in South Africa. Nonetheless, Petitioners failed to secure statements from neighbors and family, and "did not provide any reasonable explanation for the absence of any corroborating evidence." *See id.* Given Petitioners' testimony, the record does not compel the conclusion that neighbors' statements regarding the incidents of violence were unavailable.

Finally, the BIA agreed with the IJ that Petitioners failed to submit either Maureen's HIV tests or medical records to show that she was tested for HIV. Although Maureen offered an adequate explanation for the absence of a medical or police report documenting the sexual assault,[1]

---

[1]The IJ expressed concern that Maureen told no one about the rape, did not go to a hospital or to the police after she was raped, and failed to present her medical records showing that she took an HIV test. Numerous times during the hearing, however, Maureen explained the absence of a police report or hospital record documenting her rape. Maureen testified that, "[i]f you go to a hospital and a doctor, they will send you to the police." (J.A. 240.) Maureen stated that she feared involving the police "because those men said his brother is in the police and they know where we were." (J.A. 169.) According to Maureen, "[t]he man who attack[ed] me also said if I go to the police, they will slit my throat." (J.A. 193.) Moreover, she testified that she did not go to a hospital or doctor because the police and doctors treat rape victims "very badly" (J.A. 197), and "if you are raped . . . there is a label around your neck." (J.A. 240).

11

she failed to explain her failure to submit medical records indicating that she was tested for HIV.[2]

Maureen testified that she was tested for HIV in the United States in December 2000 and January 2003. (J.A. 172.) Records indicating that she had the tests performed is the type of evidence "available" and "accessible" to Petitioners. *See Shkabari*, 427 F.3d at 331 (noting that the petitioner could have sought medical evidence from doctors in this country to submit in connection with her asylum application). Accordingly, evidence that Maureen was tested for HIV was "reasonably available corroborating evidence" that Petitioners could have submitted in support of Maureen's asylum application. Consequently, we conclude that substantial evidence supports the BIA's finding that statements from Trevor's brother, neighbors, and friends, as well as evidence of Maureen's HIV tests, were types of evidence that were "reasonably available," and that Petitioners failed to provide a reasonable explanation for their failure to submit such corroborating evidence.[3] *See Liti*, 411 F.3d

---

[2]Before the BIA, Petitioners argued that they failed to submit Maureen's HIV test results because they received ineffective assistance of counsel. The BIA declined to address Petitioners' argument, concluding that Petitioners did not satisfy the *Lozada* requirements. Further, the BIA found that even if ineffective assistance of counsel explained the absence of the HIV test, it did not explain "why they failed to submit the other documents that were reasonably available." (J.A. 740.) Regardless of the merits of Petitioners' claims, the issue of whether Petitioners received ineffective assistance is not before us.

[3]We also note that, although the BIA never mentioned the absence of police reports as a basis for concluding that Petitioners failed to meet their burden of proof, the IJ explicitly found that Petitioners should have submitted police reports documenting the acts of violence. However, the record compels the finding that police reports were unavailable. Petitioners testified that the police refused to make a report regarding the assault on Maureen at the shopping center, and that the police never responded to their call for help regarding the mob attack on September 15, 1999. Further, Maureen testified that she never reported her rape to the police because she feared retaliation from her attackers. Petitioners also submitted numerous articles and reports detailing the ineffectiveness of South African police. For example, the 1999 Country Reports released by the State Department noted that, despite reforms, the South African Police Service ("SAPS") "has been left with deficiencies in midlevel leadership, and . . . . continued to be understaffed, overworked, and undertrained." (J.A. 470.) Accordingly, Petitioners met their burden of showing that police reports are not "normally . . . created or available in [South Africa]." *See Vasha v. Gonzales*, 410 F.3d 863,

at 640.

**III.    CONCLUSION**

We **DENY** the petition seeking review of the BIA's dismissal of Petitioners' appeal.

---

871 n.3 (6th Cir. 2005) ("[G]iven . . . the fact that '[t]he majority of police officers receive little or no training,' we cannot say that police records are the type of documentation normally created and accessible to current asylum applicants . . . .").